IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

C5 CAPITAL LIMITED and
ANDRÉ PIENAAR

*Applicants*,

For an Order Pursuant to 28 U.S.C. § 1782
Granting Leave to Obtain Discovery for Use
in Foreign Proceedings

MISCELLANEOUS CASE NO.:

**C5 CAPITAL LIMITED'S AND ANDRÉ PIENAAR'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR
*EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782
GRANTING LEAVE TO OBTAIN DISCOVERY FOR USE IN FOREIGN
PROCEEDINGS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

      A.     Mr. Pienaar and C5 Capital Earn Reputations for Business Acumen, Integrity, and Philanthropy. ........................................................................... 3

      B.     C5 Capital's Employment Agreement, Transfer of Employment Contract, and Settlement Agreement with Now-Former Employee Daniel Freemen. ................. 4

      C.     C5 Capital and Mr. Pienaar Learn That Daniel Freeman Is Communicating with Stein Mitchell. ........................................................................... 7

      D.     Beginning in 2018, RosettiStarr Leads a Smear Campaign Against C5 Capital and Mr. Pienaar, Circulating False and Debunked Accusations of Corruption in Connection with a Bid for the U.S. Government JEDI Cloud Contract. ............ 8

      E.     Daniel Freeman Breaches His Contracts and Defames C5 Capital and Mr. Pienaar by Misusing C5 Capital's Confidential Information and Making Disparaging and Defamatory Statements About Them to Stein Mitchell. ........... 10

      F.     This Application Seeks Evidence Necessary for Applicants to Proceed with Their U.K. Lawsuit Against Mr. Freeman. ........................................... 12

ARGUMENT ............................................................................................................... 13

I.     28 U.S.C. § 1782 Broadly Allows Discovery in Aid of Foreign Proceedings. ............... 13

II.    The Application Easily Satisfies Section 1782's Statutory Requirements. ...................... 14

III.   The Supreme Court's Discretionary *Intel* Factors All Weigh in Favor of Granting the Application. ....................................................................................... 16

      A.     The First *Intel* Factor Is Satisfied:  Stein Mitchell Is Not a Party to the Contemplated Foreign Proceeding, and Therefore the Foreign Court Will Be Unable to Compel Stein Mitchell to Provide Discovery. ..................................... 16

      B.     The Second *Intel* Factor Is Satisfied:  The U.K. Court Will Accept, Not Reject, Assistance from the Court Under Section 1782. .................................................. 17

      C.     The Third *Intel* Factor Is Satisfied:  Applicants' Request Does Not Attempt to Circumvent Foreign Proof-Gathering Restrictions. ............................................... 19

      D.     The Fourth *Intel* Factor Is Satisfied:  Applicants' Request Is Not Unduly Burdensome. ............................................................................... 20

CONCLUSION .......................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Digit. Shape Techs., Inc. v. Glassdoor, Inc.*,
No. 16-mc-80150, 2016 WL 5930275 (N.D. Cal. Oct. 12, 2016) ........................................... 21

*English v. Wash. Metro. Area Transit Auth.*,
323 F.R.D. 1 (D.D.C. 2017) ..................................................................................................... 20

*Eurasian Nat. Res. Corp. v. Simpson*,
No. 19-mc-699, 2020 WL 8456039 (D. Md. Jan. 6, 2020) ........................................... 3, 18, 19

*Food Delivery Holding 12 S.a.r.l. v. DeWitty & Assocs. CHTD*,
538 F. Supp. 3d 21 (D.D.C. 2021) .............................................................. 14, 15, 17, 19

*Gushlak v. Gushlak*,
486 F. App'x 215 (2d Cir. 2012) ............................................................................................... 1

*In re Application of Barney*,
No. 22-mc-80154, 2022 WL 17813142 (N.D. Cal. Dec. 19, 2022) .......................................... 1

*In re Application of Barnwell Enters. Ltd.*,
265 F. Supp. 3d 1 (D.D.C. 2017) .............................................................. 14, 16, 17, 19, 20, 22

*In re Application of Chodiev*,
No. 18-mc-13, 2021 WL 6805646 (D.D.C. May 17, 2021) ............................ 14, 15, 17, 20, 22

*In re Application of Credit Suisse Virtuoso*,
No. 21-mc-80308, 2022 WL 1786050 (N.D. Cal. June 1, 2022) ....................................... 18, 19

*In re Application of De Leon*,
No. 19-mc-197, 2020 WL 1047742 (D.D.C. Mar. 4, 2020) ...................................................... 1

*In re Application of DiGiulian (DiGiulian I)*,
314 F. Supp. 3d 1 (D.D.C. 2018) .............................................................................. 16, 19, 20

*In re Application of DiGiulian (DiGiulian II)*,
No. 19-mc-132, 2020 WL 5253849 (D.D.C. Sept. 3, 2020) ................................................... 14

*In re Application of Guy*,
No. 19-mc-96, 2004 WL 1857580 (S.D.N.Y. Aug. 19, 2004) .......................................... 18, 19

*In re Application of IKB Deutsche Industriebank AG*,
No. 09-cv-7852, 2010 WL 1526070 (N.D. Ill. Apr. 8, 2010) ........................................... 18, 19

*In re Application of Legatum*,
No. 21-mc-80032, 2021 WL 706436 (N.D. Cal. Feb. 23, 2021) ............................................. 21

*In re Application of Pishevar*,
No. 21-mc-105, 2023 WL 2072454 (D.D.C. Feb. 17, 2023) ...................... 3, 14, 17, 19, 21, 22

*In re Application of Varian Med. Sys. Int'l AG*,
No. 16-mc-80048, 2016 WL 1161568 (N.D. Cal. Mar. 24, 2016) ......................................... 17

*In re Application of Veiga*,
746 F. Supp. 2d 8 (D.D.C. 2010) .............................................. 15, 16, 17, 19, 20, 22

*In re Letter of Request from the Crown Prosecution Serv. of the U.K.*,
870 F.2d 686 (D.C. Cir. 1989) .......................................................... 3, 17, 19

*Infineon Techs. AG v. Green Power Techs. Ltd.*,
247 F.R.D. 1 (D.D.C. 2005) ............................................................................. 20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ................................................. 13, 14, 15, 16, 19, 20

*IS Prime Limited v. Glassdoor, Inc.*,
No. 21-mc-80178, 2021 WL 5889373 (N.D. Cal. Dec. 13, 2021) .................................... 18, 19

*Norex Petroleum Ltd. v. Chubb Ins. Co. of Can.*,
No. 04-mc-281, 2005 WL 8178298 (D.D.C. Mar. 9, 2005) ........................................... 1

*Oracle Am., Inc. v. United States*,
144 Fed. Cl. 88 (2019), *aff'd* 975 F.3d 1279 (Fed. Cir. 2020) ................................... 9

*Oracle Am., Inc. v. United States*,
975 F.3d 1279 (Fed. Cir. 2020) ...................................................................... 9

**Statutes**

28 U.S.C. § 1782 .............................................................................................. 1, 13

**Rules**

Fed. R. Civ. P. 26 ....................................................................................... 20

**United Kingdom (England) Cases**

*Nokia Corp. v. Interdigital Technology Corp.*
[2004] EWHC 2920 ....................................................................................... 18

*Soriano v. Forensic News LLC*
[2023] EWCA Civ 223 ................................................................................... 18

*South Carolina Co. v. Assurantie N.V.*
   [1987] 1 A.C. 24 (HC) ............................................................................................................ 18

## INTRODUCTION

Applicants C5 Capital Limited ("C5 Capital") and its Founder and CEO, André Pienaar—a U.K. company and U.K. citizen and domiciliary—submit this Memorandum of Law in support of their *Ex Parte*[1] Application for an Order pursuant to 28 U.S.C. § 1782 requesting limited third-party discovery from District of Columbia-based Stein Mitchell Beato & Missner LLP ("Stein Mitchell") to aid anticipated foreign litigation in the United Kingdom (England). Specifically, this Application seeks discovery for a breach of contract and/or defamation case against former C5 Capital employee Daniel Freeman—a U.K. citizen and domiciliary—who misused C5 Capital's confidential information and made false, disparaging, and defamatory statements about C5 Capital and Mr. Pienaar to Stein Mitchell in breach of his Employment Agreement and Settlement Agreement with C5 Capital (both of which are governed by English law and provide for exclusive jurisdiction in the English courts) and/or in violation of English law.

Applicants file this Section 1782 Application because critical evidence necessary for their English action is only available in this jurisdiction and the English court would almost certainly be unable to compel its production. By way of background, Applicants recently became aware of the circulation of a PowerPoint presentation created by Stein Mitchell and consulting and influence-peddling firm RosettiStarr, LLC ("RosettiStarr") that contains statements attributed to Mr. Freeman accusing Applicants of participating in an elaborate corruption scheme designed to enable Amazon to secure lucrative U.S. government contracts. And Applicants also recently

---

[1] "District courts are generally authorized to review section 1782 applications *ex parte*." *In re Application of De Leon*, No. 19-mc-197, 2020 WL 1047742, at *3 (D.D.C. Mar. 4, 2020); *see also Norex Petroleum Ltd. v. Chubb Ins. Co. of Can.*, No. 04-mc-281, 2005 WL 8178298, at *2 (D.D.C. Mar. 9, 2005) (rejecting challenge to *ex parte* nature of application); *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."); *In re Application of Barney*, No. 22-mc-80154, 2022 WL 17813142, at *2 (N.D. Cal. Dec. 19, 2022) ("Applications brought pursuant to 28 U.S.C. § 1782 typically are considered on an *ex parte* basis, since 'parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it.'" (quotation marks omitted)).

became aware of notes from an interview with Mr. Freeman in which the same and similar statements are attributed to him. Mr. Freeman's statements, which parrot accusations peddled by an Amazon competitor as part of a long-running smear campaign, are categorically false and have been repeatedly and publicly debunked by numerous courts and government entities. Nevertheless, Mr. Freeman now appears to be making those accusations, and he is misusing C5 Capital's confidential information in doing so.

Mr. Freeman has thereby breached (and appears intent on continuing to breach) contractual confidentiality and non-disparagement obligations and has violated (and appears intent on continuing to violate) English law. Accordingly, Applicants intend to shortly initiate litigation in England against Mr. Freeman. But when Applicants confronted Mr. Freeman (through counsel) with the detailed statements and quotations in the presentation and interview notes that Stein Mitchell and RosettiStarr attributed to him, he denied making them and claimed that they are all fabrications. Accordingly, Stein Mitchell (and RosettiStarr)[2] alone possess evidence and information that would confirm that Mr. Freeman made the statements they attributed to him (and will therefore also possess communications Mr. Freeman almost certainly destroyed to support his fabrication defense) or that will identify the actual person who made the statements (who, based on the content of the statements and the nature of the confidential information disclosed would have to be a C5 Capital employee or former employee subject to materially similar contractual obligations as Mr. Freeman). Either way, that evidence is necessary for Applicants to bring their U.K. (English) lawsuit against Mr. Freeman or that other person.

---

[2] C5 Capital and Mr. Pienaar are filing a similar Application to obtain discovery from RosettiStarr under 28 U.S.C. § 1782 in the U.S. District Court for the District of Maryland, where RosettiStarr is located.

As explained below, the Application satisfies all Section 1782 statutory requirements, and all discretionary factors that courts consider in evaluating Section 1782 applications weigh heavily in favor of granting the Application.  In similar circumstances, courts have repeatedly granted Section 1782 Applications seeking discovery for aid in English proceedings.  *See, e.g.*, *In re Application of Pishevar*, No. 21-mc-105, 2023 WL 2072454, at *3-4 (D.D.C. Feb. 17, 2023) *Eurasian Nat. Res. Corp. v. Simpson*, No. 19-mc-699, 2020 WL 8456039, at *1 (D. Md. Jan. 6, 2020); *see also In re Letter of Request from the Crown Prosecution Serv. of the U.K.*, 870 F.2d 686, 694 (D.C. Cir. 1989) ("*In re Letter of Request*").  The Court should grant the Application.

## FACTUAL BACKGROUND

### A.   Mr. Pienaar and C5 Capital Earn Reputations for Business Acumen, Integrity, and Philanthropy.

Mr. Pienaar has worked tirelessly for decades to become a successful businessman, entrepreneur, and philanthropist.  (Pienaar Decl. ¶ 2-4.)[3]  Since receiving his undergraduate and master's degrees in the early 1990s, Mr. Pienaar has continuously worked in the fields of business, finance, and investment, has founded companies, and has been involved in numerous philanthropic endeavors.  (*Id.*)  And through his work and dedication, Mr. Pienaar has earned a reputation an honest and ethical businessman and philanthropist and a man of integrity.  (*Id.*)

Mr. Pienaar founded C5 Capital in London, England in 2014, and since its founding, C5 Capital has grown into a highly successful specialist venture capital firm that invests in cybersecurity, space, and energy security.  (Pienaar Decl. ¶ 3; Robbertse Decl. ¶ 3.)[4]  But more

---

[3] Decl. of André Pienaar in Supp. of C5 Capital's & André Pienaar's Ex Parte Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Jan. 26, 2024) (filed contemporaneously herewith).

[4] Decl. of Arno Robbertse in Supp. of C5 Capital's & André Pienaar's Ex Parte Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Jan. 26, 2024) (filed contemporaneously herewith).

than simply investing for a profit, C5 Capital and Mr. Pienaar have made it their mission to nurture a secure digital future and have been steadfastly committed to creating value beyond profit, including by tackling issues such as conflict resolution, trafficking, corruption, and resource scarcity through C5 Philanthropy, the company's charitable arm. (Pienaar Decl. ¶ 3; Robbertse Decl. ¶ 3.) Their efforts have been successful, with C5 Capital earning a strong reputation for integrity and utilizing resources to raise awareness of technology's role in tackling corruption and improving transparency in countries around the globe. (Pienaar Decl. ¶ 3; Robbertse Decl. ¶ 3.)

**B.      C5 Capital's Employment Agreement, Transfer of Employment Contract, and Settlement Agreement with Now-Former Employee Daniel Freemen.**

Because of the importance of the confidential information that enables C5 Capital and its affiliates to successfully pursue their business, C5 Capital and its affiliates have always entered into employment agreements with their executives and employees who are privy to their confidential information that prohibit the disclosure of that information. (Robbertse Decl. ¶¶ 5-6; Pienaar Decl. ¶ 6.) And because of the importance of their reputation to their ability to attract investors and achieve their mission, C5 Capital and its affiliates have similarly entered into agreements with executives who conclude their employment with them that contain non-disparagement provisions and additional non-disclosure provisions. (Robbertse Decl. ¶¶ 8-9; Pienaar Decl. ¶ 7.) C5 Capital and its affiliate, C5 Advisory Limited, entered into precisely such agreements with their now-former executive, Daniel Freeman. (Robbertse Decl. ¶¶ 6-7, 9 & Exs. 1-3; Pienaar Decl. ¶¶ 6-7.)

On January 7, 2015, C5 Advisory Limited (a U.K. company and C5 Capital affiliate) entered into an Employment Agreement with Daniel Freeman—a U.K. citizen and domiciliary of London, England—under which it hired Mr. Freeman as the Chief Executive Officer of C5 Advisory Limited and affiliate C5 Advisory (Gulf) SPC, in which role Mr. Freeman also

worked closely with C5 Capital.  (Robbertse Decl. ¶ 6 & Ex. 1 (the **"Employment Agreement"**).)
As relevant here, the Employment Agreement contains an express provision prohibiting
Mr. Freeman from disclosing C5 Capital's and its affiliates' confidential information.
Specifically, under the terms of the Employment Agreement, Mr. Freeman "acknowledges that in
the course of [his] Employment he will have access to Confidential Information" and agrees to
"accept the restrictions" and that he "shall not ... either during the Employment or at any time after
its termination (however arising), use or disclose to any person, company or other organisation
whatsoever (and shall use his best endeavours to prevent the publication or disclosure of) any
Confidential Information."  (Robbertse Decl. Ex. 1 §§ 12.1, 12.2.)  "Confidential Information" is
defined in the Employment Agreement as "information ... relating to the business, products, affairs
and finances of the Company or any Group Company [which includes C5 Capital] for the time
being confidential to the Company or any Group Company and trade secrets, including, without
limitation ... know-how relating to the business of the Company or any Group Company."
(*Id.* § 1.1.)  This confidentiality provision is a standard provision in the employment agreements
of employees of C5 Capital and its affiliates who are privy to their confidential information.
(Robbertse Decl. ¶ 6; Pienaar Decl. ¶ 6.)  The Employment Agreement also provides that the
"agreement and any dispute or claim arising out of or in connection with it or its subject matter ...
(including non-contractual disputes or claims) shall be governed by and construed in accordance
with the law of England and Wales" and that "[t]he parties agree that the courts of England and
Wales shall have exclusive jurisdiction to settle any dispute or claim that arises out of or in
connection with this agreement or its subject matter ... (including non-contractual disputes or
claims)."  (Robbertse Decl. Ex. 1 §§ 29.1, 29.2.)

On October 26, 2016, Mr. Freeman, C5 Capital, and C5 Accelerate Limited (formerly known as C5 Advisory Limited) entered into a Transfer of Employment Contract whereby Mr. Freeman became a direct employee of C5 Capital. (Robbertse Decl. ¶ 7 & Ex. 2 (the **"Transfer of Employment Contract"**).) That agreement reincorporated as a schedule thereto Mr. Freeman's Employment Agreement. (*Id.*)

On May 17, 2021, shortly after Mr. Freeman concluded his employment with C5 Capital, Mr. Freeman and C5 Capital entered into a Settlement Agreement. (Robbertse Decl. ¶ 9 & Ex. 3 (the **"Settlement Agreement"**).) As relevant here, the Settlement Agreement contains non-disclosure and non-disparagement provisions. In Section 6 of the Settlement Agreement, Mr. Freeman acknowledged a "continuing duty of confidentiality" to C5 Capital (Robbertse Decl. Ex. 3 § 6.1.1) and agreed to:

> refrain, directly or indirectly, from making or causing to be made or publishing or causing to be published any statement about [C5 Capital] or any Employer Third Party.

(*Id.* § 6.1.2.) Mr. Freeman further agreed to:

> refrain, directly or indirectly, from using for [his] own purpose or using for the benefit of any third party or disclosing to any third party any Confidential Information belonging or relating to [C5 Capital], any Associated Entity, Portfolio Company, Fund or Investor or any confidential or private information concerning the directors, employees, workers, consultants, agents, officers or shareholders of [C5 Capital], any Associated Entity, Portfolio Company, Fund or Investor.

(*Id.* § 6.1.4.) Mr. Freeman additionally agreed to a non-disparagement provision in which he agreed to:

> refrain, directly or indirectly, from making or causing to be made or publishing or causing to be published any false, misleading, derogatory or disparaging comments about [C5 Capital] or any Employer Third Party.

(*Id.* § 6.1.3.) For purposes of the Settlement Agreement, "Employer Third Party" is defined as:

> [A]ny Associated Entity, Portfolio Company, Fund or Investor or any current or former director, employee, worker, consultant, agent, officer or shareholder of [C5 Capital] or any Associated Entity, Portfolio Company, Fund or Investor."

(*Id.* § 14.1.)  Mr. Pienaar is thus an Employer Third Party under the Settlement Agreement.  (*See id.*)  Finally, the Settlement Agreement provides that it "is to be construed in accordance with the laws of England and Wales and is subject to the exclusive jurisdiction of the Courts of England and Wales."  (*Id.* § 13.)

### C.    C5 Capital and Mr. Pienaar Learn That Daniel Freeman Is Communicating with Stein Mitchell.

On June 15, 2022, C5 Capital received a telephone call from Philip O'Beirne, a partner at Washington-DC-based Stein Mitchell, and Kip Edwards, Managing Director of RosettiStarr—a consulting and influence-peddling company in Bethesda, Maryland that holds itself out as an intelligence and investigations firm.  (Pienaar Decl. ¶ 8;  Robbertse Decl. ¶ 10; Oliveri Decl. ¶¶ 4-6 & Exs. 1-2.)[5]  Apparently not realizing that Mr. Freeman no longer worked for C5 Capital, Messrs. O'Beirne and Edwards asked to speak with him.  (Pienaar Decl. ¶ 8;  Robbertse Decl. ¶ 10.)  When told that Mr. Freeman no longer worked for C5 Capital, they stated that they would contact him directly on his mobile phone.  (Pienaar Decl. ¶ 8;  Robbertse Decl. ¶ 10.)

Based on the content of the conversation, it was apparent that Mr. Freeman had been in contact with Stein Mitchell and RosettiStarr for reasons then unknown to C5 Capital and Mr. Pienaar.  (Robbertse Decl. ¶¶ 10-11; Pienaar Decl. ¶¶ 9-10.)  But Mr. Freeman's apparent contacts with them were deeply troubling to C5 Capital and Mr. Pienaar in light of RosettiStarr's past involvement in circulating a dossier of false and defamatory accusations against C5 Capital and Mr. Pienaar relating to Amazon Web Services' bid for a large U.S. government contract:  the

---

[5] Decl. of Joseph R. Oliveri in Supp. of C5 Capital's & André Pienaar's Ex Parte Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Jan. 26, 2024) (filed contemporaneously herewith).

Joint Enterprise Defense Infrastructure ("JEDI") Cloud Procurement.  (Robbertse Decl. ¶ 11; Pienaar Decl. ¶ 10.)

**D.**     **Beginning in 2018, RosettiStarr Leads a Smear Campaign Against C5 Capital and Mr. Pienaar, Circulating False and Debunked Accusations of Corruption in Connection with a Bid for the U.S. Government JEDI Cloud Contract.**

In July 2018, the Department of Defense ("DoD") released a Request for Proposals ("RFP") for a large cloud-based computing services contract valued at up to $10 billion: the Joint Enterprise Defense Infrastructure ("JEDI") Cloud Procurement.[6]  The procurement received bids from, among others, Amazon Web Services ("AWS"), Oracle, and Microsoft, and, given its size, it received considerable interest from the public, the media, and Congress.[7]

The procurement was also the subject of numerous legal challenges and investigations.  As relevant here, Oracle, while bidding on the contract, repeatedly claimed that C5 Capital and Mr. Pienaar conspired and worked with Sally Donnelly, who was then-Senior Advisor to then-Secretary of Defense James Mattis, to unlawfully and unethically obtain improper advantages in the procurement for AWS.  More specifically, Oracle alleged that the purchase of Ms. Donnelly's interest in the company SBD Advisors—which she co-owned with Mr. Pienaar—was in fact part of an elaborate influence-peddling scheme whereby C5 Capital and Mr. Pienaar sought to obtain favorable treatment of AWS in the procurement.[8]  Those claims were repeatedly rejected:

---

[6]  JEDI Cloud RFP Package (Washington Headquarters Service, "JEDI Cloud RFP"), Solicitation No. HQ003418R0077   JEDI_CLOUD_RFP   (updated   Oct.   9,   2018),   *available   at* https://sam.gov/opp/64bdb7a54c5c436f9720246a672341ba/view;   *see   also*   Cong.   Rsch.   Serv.,   R45847,   *The Department of Defense's JEDI Cloud Program* 1-2 (Aug. 2, 2019) [hereinafter "*JEDI Cloud Report*"], *available at* https://sgp.fas.org/crs/natsec/R45847.pdf.

[7]  *JEDI Cloud Report* at 1.

[8]  *See infra* nn.9-12.

- **The General Accountability Office (GAO)** denied a protest of the procurement by Oracle and specifically rejected the assertion that conflicts of interest gave Amazon/AWS an unfair competitive advantage in it;[9]

- **The Court of Federal Claims** likewise rejected Oracle's protest of the procurement, specifically affirming as "reasonable and well supported" the Contracting Officer's conclusion that Amazon/AWS did not obtain any improper "competitive advantage";[10]

- **The U.S. Court of Appeals for the Federal Circuit** affirmed the Court of Federal Claims' decision rejecting Oracle's protest of the procurement, also specifically rejecting "the extensive array of claims raised by Oracle";[11]

- **The Department of Defense Office of the Inspector General** concluded—in a 300+ page report issued after conducting more than 80 interviews and reviewing 32 gigabytes of documents and information—that there was "*no evidence*" to support accusations of unlawful or unethical attempts to benefit AWS relating to Ms. Donnelly;[12] and

- The **Acting Director of the Office of Management and Budget**, the **Executive Chair of the Council of Inspectors General on Integrity and Efficiency**, the **U.S. Attorney's Office for the Eastern District of Virginia**, and the **Public Integrity Section of the Department of Justice's Criminal Division** all likewise rejected those same allegations.[13]

Nevertheless, by December 2018, it became widely reported in the media that RosettiStarr was circulating a "dossier" repeating those same false allegations.[14] Ultimately, Microsoft won

---

[9] *In re Oracle America, Inc.*, B-416657; B-416657.2; B-416657.3; B-416657.4 (Comp. Gen. Nov. 14, 2018), *available at* https://www.gao.gov/assets/b-416657%2Cb-416657.2%2Cb-416657.3%2Cb-416657.4.pdf.

[10] *Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88, 125-26 (2019) .

[11] *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1302-03 (Fed. Cir. 2020) .

[12] Inspector General of the Department of Defense, Report No. DODIG-2020-079, *Report on the Joint Enterprise Defense Infrastructure (JEDI) Cloud Procurement* 7, 9, 200-01 (Apr. 13, 2020), *available at* https://media.defense.gov/2020/Apr/21/2002285087/-1/-1/1/REPORT%20ON%20THE%20JOINT%20ENTERPRISE%20DEFENSE%20INFRASTRUCTURE%20(JEDI)%20CLOUD%20PROCUREMENT%20DODIG-2020-079.PDF; *see also* Letter from Sean W. O'Donnell (Acting Inspector General, Department of Defense) to Hon. Charles Grassley & Hon. Richard Durbin at 3-4 (Sept. 15, 2021) [hereinafter "DoD Inspector General Letter"], *available at* https://www.grassley.senate.gov/imo/media/doc/defense_dept.inspectorgeneraltograssleyjedireview.pdf. Emphases added unless otherwise noted.

[13] DoD Inspector General Letter at 4.

[14] *See* Naomi Nix, *Inside the Nasty Battle to Stop Amazon From Winning the Pentagon's Cloud Contract*, Bloomberg (Dec. 20, 2018), https://www.bloomberg.com/news/features/2018-12-20/tech-giants-fight-over-10-billion-pentagon-cloud-contract#xj4y7vzkg; Kevin Baron et al., *Someone Is Waging a Secret War to Undermine the Pentagon's Huge Cloud Contract*, Defense One (Aug. 20, 2018), https://www.defenseone.com/technology/2018/08/someone-waging-secret-war-undermine-pentagons-huge-cloud-contract/150685; *Dirty Tricks Surround Bidding for Pentagon Cloud-*

the JEDI Cloud Procurement,[15] but in July 2021 the DoD canceled the resulting contract and announced a new procurement for a Joint Warfighter Cloud Capability (JWCC) contract, for which it solicited bids from Microsoft, AWS, and, eventually, Oracle.[16]

### E.    Daniel Freeman Breaches His Contracts and Defames C5 Capital and Mr. Pienaar by Misusing C5 Capital's Confidential Information and Making Disparaging and Defamatory Statements About Them to Stein Mitchell.

In September 2022, while the JWCC procurement was proceeding and just three months after Stein Mitchell and RosettiStarr called C5 Capital looking for Mr. Freeman, lobbying firm Venn Strategies began distributing a PowerPoint Presentation (the **"Presentation"**) to members of Congress (among others) that, like the earlier dossier, repeated the same false and debunked accusations that C5 Capital and Mr. Pienaar illegally and unethically worked with Sally Donnelly to attempt to steer the JEDI Cloud contract to AWS.  (Robbertse Decl. ¶¶ 12-13 & Ex. 4; Pienaar Decl. ¶¶ 10-11.)  As Venn Strategies circulated the Presentation, Congressional officials informed C5 Capital of its existence, and *the Presentation's metadata expressly referenced Stein Mitchell* and RosettiStarr, thus indicating the role of both in its preparation.  (Robbertse Decl. ¶ 12; Pienaar Decl. ¶ 10.)

The Presentation contains multiple slides attributing detailed quotations to Mr. Freeman in which he discussed C5 Capital and Mr. Pienaar and made false, disparaging, and defamatory statements about them.  (Robbertse Decl. Ex. 4.)  Specifically, Mr. Freeman is quoted in the Presentation discussing C5 Capital's confidential bank account and financial information, business

---

*Computing Contract*, Seattle Times (Dec. 23, 2018), https://www.seattletimes.com/business/dirty-tricks-surround-bidding-for-pentagon-cloud-computing-contract.

[15] Press Release, U.S. Department of Defense, DOD Reaffirms Original JEDI Cloud Award to Microsoft (Sept. 4, 2020), https://www.defense.gov/News/Releases/Release/Article/2337557/dod-reaffirms-original-jedi-cloud-award-to-microsoft.

[16] Press Release, U.S. Department of Defense, Future of the Joint Enterprise Defense Infrastructure Cloud Contract (July 6, 2021), https://www.defense.gov/News/Releases/Release/Article/2682992/future-of-the-joint-enterprise-defense-infrastructure-cloud-contract.

operations, and purchases, and falsely claiming that C5 Capital purchased Ms. Donnelly's interest in SBD Advisors using money received from Amazon, thereby repeating and republishing the false and repeatedly debunked allegation that C5 Capital and Mr. Pienaar unethically, unlawfully, and covertly worked to influence Ms. Donnelly to benefit Amazon's bid in the JEDI Cloud Procurement. (*Id.*) Mr. Freeman is also shown as having discussed Mr. Pienaar and falsely suggested that Mr. Pienaar had been able to convince the DoD Acting Inspector General not to investigate him—another unlawful and unethical act. (*Id.*) Moreover, the slides indicated that Mr. Freeman had additional conversations with Stein Mitchell and RosettiStarr, as one of the quotations attributed to him began with "As I mentioned...." (*Id.*)

Congressional officials likewise informed C5 Capital that Venn Strategies was circulating a second document along with the Presentation, titled **"Freeman Interview Notes,"** which purported to summarize an interview with Mr. Freeman concerning these same topics. (Robbertse Decl. ¶ 14 & Ex. 5; Pienaar Decl. ¶ 12.) Notably, the Freeman Interview Notes expressly provide than an "interview [with Freeman] occurred this morning [June 6, 2022]"; they contain the same quotations of Mr. Freeman included in the Presentation—thus making clear their connection to Stein Mitchell RosettiStarr; and they contain additional detailed quotations attributed to Mr. Freeman in which he, among other things, discusses C5 Capital's business and falsely accuses Mr. Pienaar of dishonesty. (Robbertse Decl. Ex. 5.)

Upon learning about and reviewing the Presentation and Freeman Interview Notes, C5 Capital, through counsel, wrote to Mr. Freeman's attorneys to raise the issue of his breaches of contract and false and defamatory statements in them. (Robbertse Decl. ¶ 16 & Exs. 6-7.) But remarkably, Mr. Freeman denied making any of the detailed quotations attributed to him and claimed that they are all fabrications. (*Id.* ¶ 16 & Exs. 8-9.) Either Mr. Freeman is lying, in which

case he is certain to have deleted any documents reflecting those statements, or another similarly-situated C5 Capital employee or former employee—who would be subject to the same or substantially the same confidentiality provisions as Mr. Freeman—is in breach of his or her obligations to C5 Capital and defamed it and Mr. Pienaar and deceived or convinced Stein Mitchell and RosettiStarr to attribute his or her statements to Mr. Freeman. (Robbertse Decl. ¶¶ 15, 17; Pienaar Decl. ¶¶ 13-14.)

> **F.    This Application Seeks Evidence Necessary for Applicants to Proceed with Their U.K. Lawsuit Against Mr. Freeman.**

C5 Capital and Mr. Pienaar are preparing to file an action against Mr. Freeman (or the similarly-situated but as-yet-unidentified C5 Capital employee or former employee) for breach of contract and/or defamation in the Courts of England and Wales, which have exclusive jurisdiction over claims for breaches of Mr. Freeman's Employment Agreement, Employment Transfer Contract, and Settlement Agreement, and they have retained English counsel for that purpose. (Robbertse Decl. ¶¶ 17-18; Pienaar Decl. ¶¶ 14-15; Boswell Decl. ¶¶ 2-3.)[17]

In order to ensure that Applicants properly present their claims and bring them against the correct defendant, however, they need to obtain from Stein Mitchell (and RosettiStarr) copies of its communications from and to Mr. Freeman (or the similarly-situated C5 Capital employee or former employee whose statements were attributed to Mr. Freeman), which will provide evidence that those communications (including those in the Presentation and Freeman Interview Notes) took place (or not) and with whom. Those communications will further show the circumstances in which Mr. Freeman made his statements that will form the basis of Applicants' lawsuit and will further reflect Mr. Freeman's knowledge and state of mind (*i.e.*, culpable fault) in making them.

---

[17] Decl. of Louise Mary Boswell in Supp. of C5 Capital's & André Pienaar's Ex Parte Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Jan. 26, 2024) (filed contemporaneously herewith).

Moreover, those communications will either debunk Mr. Freeman's claim that the quotations that Stein Mitchell (and RosettiStarr) attributed to him are fabrications or they will identify which similarly-situated C5 Capital employee or former employee with knowledge of C5 Capital's confidential information breached his or her employment agreement that as a matter of course would contain a non-disclosure provision like that in Mr. Freeman's Employment Agreement and defamed C5 Capital and Mr. Pienaar—and would allow C5 Capital and Mr. Pienaar to properly address their forthcoming lawsuit in the Courts of England and Wales against the correct defendant.

## <u>ARGUMENT</u>

**I.      28 U.S.C. § 1782 Broadly Allows Discovery in Aid of Foreign Proceedings.**

28 U.S.C. § 1782 "is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).   And over time, Congress has consistently and "substantially broadened the scope of assistance federal courts could provide for foreign proceedings." *Id.* at 247-48.

As relevant here, Section 1782 provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal ... The order may be made ... upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced[.]

28 U.S.C. § 1782(a).   Thus, Section 1782 authorizes federal courts to grant an application for discovery as long as three statutory requirements are satisfied: **(1)** the person from whom discovery is sought resides or is found in the district of the district court where the application is made; **(2)** the discovery is for use in a proceeding before a foreign tribunal; and **(3)** the application is made by an interested person. *Id.*; *In re Application of Barnwell Enters. Ltd.*, 265 F. Supp. 3d 1, 8-9 (D.D.C.

2017).  "Once the[se] initial requirements of § 1782 are met, district courts have considerable discretion to grant a § 1782 application."  *In re Application of Chodiev*, No. 18-mc-13, 2021 WL 6805646, at *9 (D.D.C. May 17, 2021) (quotation marks omitted).

In exercising its discretion to grant discovery, district courts consider four factors identified by the Supreme Court in *Intel*:  **(1)** whether the person from whom discovery sought is a participant in the foreign proceeding; **(2)** the nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the foreign government to U.S. federal court judicial assistance; **(3)** whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and **(4)** whether the request is unduly burdensome.  *Intel*, 542 U.S. at 264-65.

As explained below, because the Application easily satisfies all three statutory Section 1782 requirements and all four discretionary factors, the Court should grant the Application for limited discovery.

## II.     The Application Easily Satisfies Section 1782's Statutory Requirements.

The Application for a narrow subpoena to Stein Mitchell easily satisfies Section 1782's three statutory requirements.

***First***, Stein Mitchell resides or is found in this district because it is headquartered and has its office in Washington, D.C.  (Oliveri Decl. ¶¶ 4-6 & Exs. 1-2.)  Under settled law, a business entity is "found" in the judicial district where it is headquartered.  *See, e.g.*, *In re Application of Pishevar*, No. 21-mc-105, 2023 WL 2072454, at *2 (D.D.C. Feb. 17, 2023); *In re Application of DiGiulian (DiGiulian II),* No. 19-mc-132, 2020 WL 5253849, at *3 (D.D.C. Sept. 3, 2020); *see also Food Delivery Holding 12 S.a.r.l. v. DeWitty & Assocs. CHTD*, 538 F. Supp. 3d 21, 27 (D.D.C. 2021).

14

**Second**, the Application seeks discovery for use in a proceeding before a foreign tribunal, namely, the Courts of England and Wales in the United Kingdom. As the U.S. Supreme Court has explained, the requisite foreign proceeding "need not be 'pending' or 'imminent'"; rather, "the 'proceeding' for which discovery is sought under § 1782(a)" need only be "in reasonable contemplation." *Intel*, 542 U.S. at 247; *accord In re Application of Veiga*, 746 F. Supp. 2d 8, 23 (D.D.C. 2010). Here, as detailed above, Applicants intend to file an action for breach of contract and/or before the English Court, upon obtaining discovery from Stein Mitchell confirming Mr. Freeman as source of the statements attributed to him or revealing the identity of the actual similarly-situated C5 Capital employee or former employee who made those statements. (Robbertse Decl. ¶ 17; Pienaar Decl. ¶ 14.) And demonstrating the promptness with which they plan to initiate that lawsuit, Applicants have already retained English counsel to pursue those claims. (Robbertse Decl. ¶ 18; Pienaar Decl. ¶ 15; Boswell Decl. ¶¶ 2-3.) As such, the proceeding is "in reasonable contemplation." Moreover, as this District has recognized, this factor "requires only a '*de minimis*' showing of relevance, 'broadly construed,' and when in doubt, courts should err on the side of overinclusion." *Chodiev*, 2021 WL 6805646, at *9 (quoting *Veiga*, 746 F. Supp. 2d at 18). Here, the communications sought in the Application are directly and highly relevant to confirming the identity of the proper defendant and determining his knowledge and state of mind (*i.e.*, culpable fault) in making them.

**Third**, Applicants, as the plaintiffs in the foreign action, qualify as "interested part[ies]" entitled to seek discovery under Section 1782. As the Supreme Court has explained, "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256; *accord Food Delivery Holding*, 538 F. Supp. 3d

at 27 ("[Applicant] is an interested person because it is a party to the ... relevant foreign proceeding."); *Veiga*, 746 F. Supp. 2d at 17 (same).

### III.    The Supreme Court's Discretionary *Intel* Factors All Weigh in Favor of Granting the Application.

All of the discretionary *Intel* factors likewise demonstrate that the Court should grant the Application for limited discovery from Stein Mitchell.

#### A.    The First *Intel* Factor Is Satisfied:  Stein Mitchell Is Not a Party to the Contemplated Foreign Proceeding, and Therefore the Foreign Court Will Be Unable to Compel Stein Mitchell to Provide Discovery.

The first *Intel* factor weighs in favor of discovery in this case because Stein Mitchell will not be a party to the contemplated foreign proceeding—and it has no presence in the United Kingdom.  As the Supreme Court has explained, while "[a] foreign tribunal has jurisdiction over those appearing before it ... [i]n contrast, nonparticipants in [a] foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Intel*, 542 U.S. at 244; *see also, e.g.*, *Barnwell*, 265 F. Supp. 3d at 10 (factor weighs in favor of discovery where party from whom discovery is sought is "not a party in the foreign proceeding[]" such that there was no "reason to believe that [it] is within the jurisdictional reach of the court in [the foreign proceeding] or that the evidence in [its] possession is obtainable in the [foreign] proceedings absent a section 1782 request"); *In re Application of DiGiulian (DiGiulian I)*, 314 F. Supp. 3d 1, 7 (D.D.C. 2018)  ("Petitioners and the [foreign] court lack the legal authority to command [nonparticipant's] attendance[,] his production of documents, or his testimony.  Therefore, this factor weighs in favor of granting Petitioners' request.").

Here, Stein Mitchell will not be a participant in or party to Applicants' breach of contract and/or defamation case against Mr. Freeman (or the similarly-situated C5 Capital employee or

former employee) in the United Kingdom.  And Stein Mitchell has no U.K. office or presence. (*See* Oliveri Decl. ¶ 7, *see also id.* ¶¶ 4-6 & Exs. 1-2.)  As such, the English (U.K.) court would almost certainly be unable to compel Stein Mitchell (a U.S. entity) to produce discovery, rendering this Application the only mechanism through which Applicants can obtain from Stein Mitchell information necessary for English lawsuit.  This factor thus weighs heavily in favor of granting the Application.

### B.    The Second *Intel* Factor Is Satisfied:  The U.K. Court Will Accept, Not Reject, Assistance from the Court Under Section 1782.

The second *Intel* factor—the nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the foreign government to U.S. federal court judicial assistance— likewise weighs heavily in favor of discovery.  "Courts in the United States … presume that foreign tribunals will be receptive to evidence obtained here," *Pishevar*, 2023 WL 2072454, at *3, and, as such, this factor weighs in favor of allowing discovery unless there is "'authoritative proof' that the foreign tribunal would reject the evidence sought," *Barnwell*, 265 F. Supp. 3d at 10-11 (quoting *Viega*, 746 F. Supp. 2d at 23-24 ("Absent a clear and unequivocal indication that the foreign tribunal would not be receptive to the evidence sought, this Court's role is a limited one."); *Chodiev*, 2021 WL 6805646, at *9; *Food Delivery Holding*, 538 F. Supp. 3d at 29.  Moreover, in evaluating this factor, courts "err on the side of permitting discovery."  *In re Application of Varian Med. Sys. Int'l AG*, No. 16-mc-80048, 2016 WL 1161568, at *4 (N.D. Cal. Mar. 24, 2016).

Notably, "[t]he nature of the English court system ... raise[s] no concerns in this U.S. court," *Pishevar*, 2023 WL 2072454, at *3, and district courts routinely grant requests for discovery under Section 1782 for use in litigation before the English Courts.  *See, e.g.*, *In re Letter of Request*, 870 F.2d at 694 (affirming grant of Section 1782 application); *Pishevar*, 2023 WL 2072454, at *4; *Eurasian Nat. Res. Corp. v. Simpson*, No. 19-mc-699, 2020 WL 8456039, at *1

(D. Md. Jan. 6, 2020) ("[T]here is no suggestion that the [U.K.] court presiding over the foreign proceedings would not be receptive to the assistance.").[18]  And English Solicitor and Solicitor Advocate Louise Mary Boswell has explained in her Declaration that based on her experience, English courts are receptive to receiving evidence obtained from U.S. courts under 28 U.S.C. § 1782 and would be so receptive in this matter.  (Boswell Decl. ¶¶ 4-10 & Exs. 2-4.)

Indeed, the House of Lords in *South Carolina Co. v. Assurantie N.V.* [1987] 1 A.C. 24, 42 (HC), expressly held that a party does nothing wrong "by seeking to exercise a right potentially available to them under the Federal law of the United States [under 28 U.S.C. § 1782]," and such applications do not "in any way depart[] from, or interfere[] with, the procedure of the English court."  (Boswell Decl. ¶ 5 & Ex. 2.)  And the holding in *South Carolina Co.* has been affirmed in numerous subsequent decisions in which the English courts have been receptive to evidence obtained from U.S. Courts under 28 U.S.C. § 1782.  (Boswell Decl. ¶ 6; *see, e.g. id.* ¶ 7 & Ex. 3 (*Nokia Corp. v. Interdigital Technology Corp.* [2004] EWHC 2920, ¶ 23, ("It is legitimate for the requesting party to use the [Section 1782] request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings."); *id.* ¶ 8 & Ex. 4 (*Soriano v. Forensic News LLC* [2023] EWCA Civ 223, ¶¶ 23-29 (rejecting argument that discovery should not be allowed under 28 U.S.C. § 1782 even where a U.S. court may take a broader approach to discovery than the English Court).

---

[18] *See also, e.g.*, *In re Application of Credit Suisse Virtuoso*, No. 21-mc-80308, 2022 WL 1786050, at *10-11 (N.D. Cal. June 1, 2022) ("[N]o [] aspect of the nature of the English court or the character of the anticipated English proceedings weighs against [the Section 1782] application."); *IS Prime Limited v. Glassdoor, Inc.*, No. 21-mc-80178, 2021 WL 5889373, at *3-4 (N.D. Cal. Dec. 13, 2021) (granting Section 1782 application relating to U.K. proceedings); *In re Application of IKB Deutsche Industriebank AG*, No. 09-cv-7852, 2010 WL 1526070, at *4 (N.D. Ill. Apr. 8, 2010) (same); *In re Application of Guy*, No. 19-mc-96, 2004 WL 1857580, at *2-3 (S.D.N.Y. Aug. 19, 2004) (There is no "reason to suppose that the government of the United Kingdom would disfavor granting Applicants relief under § 1782.").

Here, this factor weighs heavily in favor of granting the Application because not only is there no "authoritative proof"—or any proof whatsoever—that the English court would reject the evidence sought, but there is affirmative evidence that it would accept that evidence.

### C.    The Third *Intel* Factor Is Satisfied:  Applicants' Request Does Not Attempt to Circumvent Foreign Proof-Gathering Restrictions.

The third *Intel* factor weighs in favor of discovery when there is no evidence that an application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 264-65; *accord Food Delivery Holding*, 538 F. Supp. 3d at 30; *DiGiulian I*, 314 F. Supp. 3d at 8.  That is precisely the case here, as Applicants' U.K. counsel has explained in her Declaration that she is not aware of any restrictions on proof-gathering procedures under English law that would prohibit obtaining the discovery sought in the Application.  (Boswell Decl. ¶ 10.)  To the contrary, Ms. Boswell has explained that the Courts of England and Wales welcome evidence obtained through Section 1782 Applications.  (Boswell Decl. ¶¶ 4-10 & Exs. 2-4.)  And U.S. courts have repeatedly recognized that as well.  *See, e.g.*, *In re Letter of Request*, 870 F.2d at 694; *Pishevar*, 2023 WL 2072454, at *4; *Eurasian*, 2020 WL 8456039, at *1.[19]

Moreover, as courts in this District have explained, "there is no requirement in [Section 1782] that a[n] [applicant] exhaust their discovery options in a foreign forum before seeking discovery here."  *Barnwell*, 265 F. Supp. 3d at 13; *DiGiulian*, 314 F. Supp. 3d at 8 ("[L]itigants are not required to seek discovery through the foreign tribunal prior to requesting through the United States.");  *Veiga*, 746 F. Supp. 2d at 24 (holding it "simply irrelevant" that applicants did not seek comparable discovery in the foreign tribunal before filing a Section 1782

---

[19] *See also, e.g.*, *Credit Suisse Virtuoso*, 2022 WL 1786050, at *10; *IS Prime*, 2021 WL 5889373, at *4; *IKB Deutsche*, 2010 WL 1526070, at *4; *Guy*, 2004 WL 1857580, at *2-3.

application).  "Courts have refused to engraft a quasi-exhaustion requirement onto section 1782 that would force litigants to seek information through the foreign or international tribunal before requesting discovery from the district court."  *Barnwell*, 265 F. Supp. 3d at 13 (collecting cases). Even "attempting to more efficiently obtain use of relevant documents from a district court does not evidence an intent to circumvent foreign discovery rules."  *Veiga*, 746 F. Supp. 2d at 24 (citing *Infineon Techs. AG v. Green Power Techs. Ltd.*, 247 F.R.D. 1, 5 (D.D.C. 2005)).  Indeed, absent a bad-faith attempt to undermine a foreign tribunal's restrictions or policies, this factor weighs in favor of allowing discovery even if (unlike here) the documents sought would not be discoverable in the foreign jurisdiction.  *Intel*, 542 U.S. at 260-63.

Because, as explained above, there are no proof-gathering restrictions under English law and no English or U.S. policies that would prohibit obtaining the discovery sought in the Application, this factor weighs heavily in favor of granting the Application.

### D.     The Fourth *Intel* Factor Is Satisfied:  Applicants' Request Is Not Unduly Burdensome.

The fourth *Intel* factor weighs in favor of discovery when the discovery requests are not "unduly intrusive or burdensome," *Intel*, 542 U.S. at 265, "in accordance with the Federal Rules of Civil Procedure," *DiGiulian I*, 314 F. Supp. 3d at 5.  Under ordinary discovery rules, a party may "'obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.'"  *English v. Wash. Metro. Area Transit Auth.*, 323 F.R.D. 1, 8, 17 (D.D.C. 2017) (quoting Fed. R. Civ. P. 26(b)).  "Relevance is construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on a party's claim or defense."  *Id.* at 17; *see also Chodiev*, 2021 WL 6805646, at *9 ("[T]he subject matter of the [discovery] requests" need only be "reasonably tailored to speak to the claims and defense[s] ... in the [foreign] proceedings."); *Veiga*, 746 F. Supp. 2d at 25 (same).

As relevant here, district courts across the country have repeatedly held that this factor weighs in favor of granting a Section 1782 application where the applicant seeks discovery to reveal (or, here, confirm) the identity of a person who allegedly infringed the applicants' rights. *See, e.g.*, *Pishevar*, 2023 WL 2072454, at *4 (granting application for "documentary and testamentary subpoenas requiring [nonparticipant] to identify the UK Source [who defamed applicant], the client who hired [nonparticipant] to investigate [applicant], and related information"); *In re Application of Legatum*, No. 21-mc-80032, 2021 WL 706436, at *3 (N.D. Cal. Feb. 23, 2021) (similar); *Digit. Shape Techs., Inc. v. Glassdoor, Inc.*, No. 16-mc-80150, 2016 WL 5930275, at *2 (N.D. Cal. Oct. 12, 2016) (similar).

Here, Applicants seek only narrow discovery from Stein Mitchell: (1) communications and documents exchanged with Daniel Freeman (or, if Mr. Freeman did not make the statements attributed to him in the Presentation and Freeman Interview Notes, the similarly-situated C5 Capital employee or former employee) that relate to C5 Capital, Mr. Pienaar, and/or the JEDI Cloud Procurement—the precise subjects of the statements on which Applicants' English law breach of contract and/or defamation claims are based; and (2) a maximum three-hour deposition in which a RosettiStarr corporate representative can authenticate the documents produced and testify about them, the Presentation and Freeman Interview Notes, and Mr. Freeman's communications with RosettiStarr about C5 Capital, Mr. Pienaar, and/or the JEDI Cloud Procurement. These documents are directly relevant to Applicants' claims and defenses in their forthcoming English lawsuit, and in light of Mr. Freeman's denial that he made the statements attributed to him in the Presentation and Freeman Interview Notes, they are absolutely necessary for Applicants to bring their claims against him (or against the similarly-situated C5 Capital employee or former employee who made the statements attributed to Mr. Freeman). Moreover,

the time period from which Applicants seek discovery is appropriately limited to the time period

after Mr. Freeman entered into the contracts that Applicants allege he breached.  Such requests—

and even much broader requests—are routinely approved as not unduly burdensome.  *See, e.g.*,

*Pishevar*, 2023 WL2072454, at *4; *Chodiev*, 2021 WL 6805646, at *9-10; *Veiga*, 746 F. Supp. 2d

at 16, 25; *Barnwell*, 265 F. Supp. 3d at 9.[20]

## **CONCLUSION**

For the foregoing reasons, Applicants C5 Capital and André Pienaar respectfully request

that the Court grant their Application and issue an Order authorizing the issuance of discovery.

A Proposed Order is attached to the Application as **Exhibit A**, a proposed document subpoena is

attached as **Exhibit B**, and a proposed deposition subpoena is attached as **Exhibit C**.

Dated: January 26, 2024

  */s/ Joseph R. Oliveri*
Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Joseph R. Oliveri (D.C. Bar No. 994029)
Steven Harrison (D.D.C. Bar No. VA134)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
tom@clarelocke.com
joe@clarelocke.com
steven@clarelocke.com

*Attorneys for Applicants C5 Capital Limited*
*and André Pienaar*

---

[20] Applicants' counsel will, of course, meet and confer with Stein Mitchell's counsel to discuss ways to obtain this discovery as efficiently and with as little burden as possible.