# EXHIBIT B

VIRGINIA:

IN THE CIRCUIT COURT OF CHESTERFIELD COUNTY

ANDRÉ PIENAAR,

     *Plaintiff,*

v.

ALAN SUDERMAN,

     Serve: 3605 Muirfield Green Place,
     Midlothian, VA 23112-4529

     *Defendant.*

Civil Action No. CL23. 3390

## COMPLAINT

1.     Plaintiff André Pienaar brings this defamation action against Alan Suderman, a reporter for the Associated Press, for falsely accusing him of misusing client funds and improperly managing C5 Capital Limited, the investment firm of which Mr. Pienaar is the Founder and Chief Executive Officer, in a malicious campaign to manufacture a sensational news story to draw attention to himself and his reporting—even though he knows that his accusations about Mr. Pienaar are false.

2.     Specifically, Suderman—who has connections to the influence-peddling firm RosettiStarr and who in recent years has focused his reporting on stories involving allegations of corruption, criminality, cybersecurity, and foreign influence—has sent messages to numerous colleagues, former colleagues, associates, investors, and acquaintances of Mr. Pienaar in which he has stated that Mr. Pienaar has caused "financial irregularities" at C5 Capital and "used investor funds for personal gain."

3.     Those accusations are unequivocally false. Mr. Pienaar has never caused "financial irregularities" at C5 Capital (or anywhere) and has never "used investor funds for personal gain." To the contrary, over the course of his career and during his near-decade operating C5 Capital, Mr. Pienaar has worked tirelessly to earn—and has, in fact, earned—a reputation as an ethical businessman, a philanthropist, and a man of integrity.

4.     Moreover, not only are Suderman's accusations about Mr. Pienaar false, Suderman knows they are false. Although Suderman claimed in his messages to Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances that he has reporting and records supposedly showing the truth of his accusations, when at least one of the recipients of Suderman's accusations subsequently pressed him on his supposed support for them, Suderman was unable to identify any such support. Rather, and further confirming his knowledge that his accusations are false, Suderman claimed that his false accusations against Mr. Pienaar were supported by a six-month-old article published by the controversial outlet Breitbart—but the article he cited did not even purport to report on any supposed "financial irregularities" at C5 Capital or Mr. Pienaar supposedly "us[ing] investor funds for personal gain." And while that article contained different allegations about Mr. Pienaar (allegations that have been trafficked by RosettiStarr), even those allegations have been thoroughly and publicly debunked by multiple courts and governmental agencies that have investigated them. But none of that mattered to Suderman, who at the apparent urging of RosettiStarr had found a target in Mr. Pienaar about whom to write a sensational, attention-grabbing story.

5.     However, because Suderman knew his accusations about Mr. Pienaar are false, he knew he had to manufacture some sort of colorable support for the narrative he wanted to spin. So, he began contacting Mr. Pienaar's colleagues, former colleagues, associates, investors, and

2

acquaintances, telling them that he had evidence that Mr. Pienaar caused "financial irregularities" and "used investor funds for personal gain" at C5 Capital, and asking them to comment on those accusations. This tactic is known as "push-polling"—a term derived from the opinion-polling industry in which a questioner attempts to bias and influence the responses of the person to whom he or she is asking questions. And it violates the most fundamental journalistic ethics—and runs directly counter to the Associated Press's own "Values and Principles," which boast that "[w]e will not knowingly introduce rumor or false information into material intended for publication or broadcast" and that the Associated Press "insist[s] on the highest standards of integrity and ethical behavior as we gather and deliver the news."[1] Suderman disregarded those basic journalistic ethics. Because, again, Suderman didn't care.

6.  And worse still, because apparently his push-polling efforts did not elicit the negative comments he hoped to generate for his story, Suderman has repeatedly harassed Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances who have not responded to him, and Suderman has even gone so far as to threaten Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances that if they do not provide negative comments about Mr. Pienaar to him then he will include them in the hit piece he is working on. And Suderman has further worked with a disgruntled former C5 Capital affiliate employee who has made similar threats to Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances.

7.  Suderman's accusations against Mr. Pienaar, which accuse him of criminal activity and unfitness for his profession, are defamatory *per se*. And they have had a real, damaging effect

---

[1]  Associated Press Values and Principles: Introduction, https://www.ap.org/about/news-values-and-principles/introduction.

on the reputation for honesty in business and as a man of integrity that Mr. Pienaar has worked tirelessly to earn over the course of decades.

8.      Mr. Pienaar brings this lawsuit to put an end to Suderman's tortious conduct, to hold him responsible for the harm he has knowingly caused, and to set the record straight.

## PARTIES AND RELEVANT NON-PARTIES

9.      Plaintiff André Pienaar is a United Kingdom citizen who resides and is domiciled in London, England, United Kingdom. Mr. Pienaar is a cybersecurity, space, and energy expert and investor, and a philanthropist. Mr. Pienaar is the Founder, CEO, and Head of Investor Relations of C5 Capital Limited.

10.     Defendant Alan Suderman is a citizen of the Commonwealth of Virginia and a resident and domiciliary of Midlothian, Virginia, in Chesterfield County, Virginia.

11.     Relevant Non-Party C5 Capital Limited ("C5 Capital") is a company formed under the laws of the United Kingdom and is headquartered in London, England, United Kingdom. C5 Capital is a specialist venture capital firm that invests in cybersecurity, space, and energy security and is dedicated to nurturing a secure digital future.

12.     Relevant Non-Party RosettiStarr LLC ("RosettiStarr") is a consulting and influence-peddling company headquartered in Bethesda, Maryland that holds itself out as an intelligence and investigations firm. RosettiStarr has performed work, both directly and indirectly through contractors and others, for Oracle Corp. relating to Oracle's bids for government contracts and has previously circulated a dossier of false and defamatory accusations against Mr. Pienaar (and C5 Capital) relating to Amazon Web Services' bid for a large U.S. government contract: the Joint Enterprise Defense Infrastructure Cloud Procurement.

4

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this case because the amount in controversy exceeds $25,000. *See* Va. Code Ann. §§ 16.1-77, 17.1-513.

14.     This Court has general and specific personal jurisdiction over Defendant Suderman under Virginia law and the Due Process Clause of the U.S. Constitution because he is a citizen, resident, and domiciliary of the Commonwealth of Virginia.  This Court also has specific personal jurisdiction over Defendant Suderman under Virginia's long-arm statute, Va. Code Ann. § 8.01-328.1, as well as under the Due Process Clause of the U.S. Constitution, because, among other things, the causes of action asserted in this Complaint arise from Defendant Suderman causing tortious injury by an act or omission in the Commonwealth of Virginia.

15.     Venue is proper in Chesterfield County under Va. Code Ann. § 8.01-262 because Defendant Suderman resides in Chesterfield County and because the causes of action asserted in this Complaint arose in Chesterfield County.

## FACTUAL ALLEGATIONS

### Mr. Pienaar Founds C5 Capital and Earns a
### Reputation as a Respected, Ethical Businessman and Philanthropist

16.     Mr. Pienaar received a Bachelor of Jurisprudence from Nelson Mandela University in South Africa in 1991 (*cum laude*), a Bachelor of Laws (LLB) degree from Nelson Mandela University in 1993, and a Master of Science (Economics) degree in Strategic Studies, International Relations, and National Security Studies from the University of Wales in 1995 (*cum laude*). Since receiving his degrees, he has worked in the fields of business, finance, and investment and has founded multiple companies.

17.     Mr. Pienaar founded C5 Capital in London, England in 2014, and since its founding, C5 Capital has grown into a highly successful specialist venture capital firm that invests

in cybersecurity, space, and energy security.   But more than simply investing for a profit, C5 Capital and Mr. Pienaar have made it their mission to nurture a secure digital future and have been steadfastly committed to creating value beyond profit, including by tackling issues such as conflict resolution, trafficking, corruption, and resource scarcity through C5 Philanthropy, the company's charitable arm.   Their efforts have been successful, with C5 Capital earning a strong reputation for integrity and utilizing resources to raise awareness of technology's role in tackling corruption and improving transparency in countries around the globe.

18.     In addition to pursuing business ventures and working with C5 Capital in its charitable and philanthropic endeavors, Mr. Pienaar has long been an active and dedicated philanthropist.   To that end, among other things, Mr. Pienaar serves on the Advisory Council of the United States Institute for Peace (a U.S. government agency dedicated to global conflict resolution), serves as a Director of the International Centre for Missing and Exploited Children, serves as Director of the Limitless Space Institute (a non-profit organization that cultivates leaders and develops technologies that enable space exploration), is a member of the Atlantic Council Task Force on Critical Infrastructure and Cybersecurity, and developed and stood up the Cyber Alliance to Defend Our Healthcare (a voluntary coalition of 36 cybersecurity companies working to protect the healthcare sector from cyberattacks during global pandemics).

19.     Through tireless work and dedication over decades, Mr. Pienaar has earned a reputation as an honest and ethical businessman, entrepreneur, and philanthropist, and as a man of integrity.

### Alan Suderman Works to Carve Out a Niche Reporting on Cybersecurity and Alleged Criminality Amidst a Journalistic Career Marked by False and Inaccurate Reporting

20.     Alan Suderman has worked as a reporter for decades, and since 2013 has worked for the Associated Press.

21.     For many years at the Associated Press, Suderman's work focused primarily on publishing articles related to Virginia state government and politics.

22.     But beginning around 2020, Suderman—in an apparent effort to report on higher-profile subjects that would draw more readers to his reporting—began to shift the focus of his reporting to stories about cybersecurity, matters of international intrigue, and allegations of corruption and criminality.[2]

23.     Yet Suderman's journalistic career has long been marked by his publication of falsehoods and incorrect information that have required corrections to his articles. And many of his false and incorrect claims requiring correction have gone to the heart of the articles that he has published. For example, articles Suderman has authored or co-authored have:

- Falsely reported the number of votes cast in a Virginia election by over one million votes (3.5 million as opposed to 2.3 million) and falsely reported that "more than twice as many people in Virginia voted" in the 2019 election than in the 2015 election— a 200% increase—when in truth the increase was only 50%;[3]

- Falsely reported, in a story about then-South Carolina Governor Mark Sanford, that Governor Sanford had resigned when in fact he completed his term as Governor;[4]

- Incorrectly identified the information system of a school that had been cyberattacked in a story about cyberattacks on school information systems;[5]

[2] *See, e.g.*, Alan Suderman, *Amid Strained US Ties, China Finds Unlikely Friend in Utah*, Associated Press (Mar. 27, 2023), https://apnews.com/article/china-foreign-influence-utah-legislature-mormon-church-921526d0e8eda2732c361488d20dd1b4; Alan Suderman, *FBI Probing Ex-CIA Officer's Spying for World Cup Host Qatar*, Associated Press (Oct. 27, 2022), https://apnews.com/article/world-cup-technology-sports-soccer-religion-5af544d34eded38ff4093587d2efa0de; Alan Suderman et al., *Whistleblower Accuses Twitter of Cybersecurity Negligence*, Associated Press (Aug. 23, 2022), https://apnews.com/article/technology-federal-trade-commission-us-securities-and-exchange-f1fe41b0bd7c5c407eefb83509c671f5.

[3] Alan Suderman, *Correction: Election 2019-Virginia Legislature Story*, Associated Press (Nov. 6, 2019), https://www.news4jax.com/news.politics/2019/11/06/democrats-promise-swift-action-after-win-in-virginia.

[4] Thomas Beaumont et al., *Trump Critic Mark Sanford Toppled in S. Carolina, 'Vicious' Va. Senate Race Set*, Associated Press (June 13, 2018), https://www.nbcphiladelphia.com/news/national-international/primaries-south-carolina-maine-nevada-north-dakota-virginia-2/2064135.

[5] Cedar Attanasio, Michael Melia & Alan Suderman, *Cyberattacks Increasingly Hobble Pandemic-Weary US Schools*, Associated Press (Feb. 1, 2022), https://www.claimsjournal.com/news/national/2022/02/01/308372.htm.

- Falsely attributed a quotation to a source who did not provide the quotation;[6]

- Incorrectly reported the job title and position of one of the primary sources (and one of only five people) quoted in an article;[7] and

- Falsely reported that a candidate for the D.C. Council finished in a distant third to a candidate who received fewer votes than he did.[8]

24.     And Suderman's reporting has also been marked by other errors indicative of poor and sloppy work that have required the issuance of corrections.  For example, articles Suderman has authored or co-authored have:

- Incorrectly reported the name of the Speaker of the Virginia House of Delegates in an article about legislation in Virginia;[9]

- Falsely reported, in an article reporting that "Virginia has among the nation's weakest political ethics laws," that ethics reform bills were passed by a Republican-controlled legislature in the summer when they were in fact passed by a Democrat-controlled legislature in the spring;[10] and

- Incorrectly captioned the photograph at the top of an article.[11]

25.     Upon information and belief, in light of the numerous corrections that have been made to articles that Suderman has authored or coauthored for the Associated Press, the Associated Press and its editors who work with Suderman are aware that Suderman's reporting has required numerous corrections.

---

[6] Alan Suderman & Ben Wieder, *Secret Money Is Now Swaying State Judicial Elections*, Center for Public Integrity/Mother Jones (June 13, 2013), https://www.motherjones.com/politics/2013/06/state-supreme-court-election-spending.

[7] Alan Suderman, *Correction: Energy Efficiency-Dominion Story*, Associated Press (Mar. 21, 2019), https://apnews.com/article/aac156a405c74b1d8a3eeecb17388fbd.

[8] Alan Suderman, *Try and Try and Try Again*, Wash. City Paper (Apr. 4, 2013). https://washingtoncitypaper.com/article/346251/try-and-try-and-try-again.

[9] Alan Suderman, *Correction: XGR-Medicaid Expansion Story*, Associated Press (May 31, 2018), https://apnews.com/article/f7f5101baan45443aae2eb98903c20199.

[10] Larry O'Dell et al., *Correction: Former Governor Trial Story*, Associated Press (Sept. 5, 2014), https://apnews.com/article/elections-richmond-virginia-6d93ef03c5034067b31dacba23ad5a67.

[11] Alan Suderman, *Witt, Jr. Spoils Twins' No-Hit Bid with One Out in the 9th*, Associated Press (Sept. 13, 2022), https://www.kshb.com/sports/witt-jr-spoils-twins-no-hit-bid-with-one-out-in-the-9th.

### Suderman Develops a Relationship with
### Influence-Peddling Firm RosettiStarr

26.     At the same time Suderman shifted the focus of his reporting from local Virginia

state government and politics to stories about cybersecurity and allegations of corruption and

criminality, Suderman, upon information and belief, developed a relationship with the beltway

influence-peddling firm RosettiStarr, including through RosettiStarr Managing Director R. Jeffrey

Smith, who, like Suderman, previously worked for the Center for Public Integrity.

27.     Upon information and belief, Suderman has been provided documents and

materials by RosettiStarr and/or its personnel (whether directly or indirectly through others) and

RosettiStarr has encouraged Suderman to pursue certain stories, angles, and 'investigations' in his

reporting.

### Seeking to Manufacture a Sensational Story in Line with His
### New Focus on Stories of Corruption, Criminality, and Cybersecurity,
### Suderman Launches a Push-Polling Campaign Falsely Accusing
### Mr. Pienaar of Criminal and Fraudulent Acts

28.     In or around June 2023, Suderman—in line with his recent journalistic bent toward

tales of international intrigue, corruption, criminality, and cybersecurity, and upon information and

belief at the encouragement of RosettiStarr and R. Jeffrey Smith—began writing to colleagues,

former colleagues, associates, investors, and acquaintances of Mr. Pienaar—a U.K. citizen who,

along with U.K.-based C5 Capital, has long invested in the cybersecurity space—and accusing

Mr. Pienaar of corruption and criminal conduct.

29.     To that end, on July 11, 2023, Suderman sent the following message to Pippa

Streatfeild, Mr. Pienaar's former executive assistant, via the website LinkedIn.com:

Hello Ms. Streatfeild,

My name is Alan Suderman and I'm a reporter at the Associated Press. I'm working
on a story about Andre Pienaar and C5 [Capital].

> *I have some reporting showing financial irregularities with how Andre operated C5, including records that indicate he may have used investor funds for personal gain.* I've also spoken with some folks who used to work with Andre and they suggested I reach out to you to help me confirm some details.
>
> I know this might be a sensitive topic for you, so happy to talk off the record. Your perspective could really help.
>
> Could you please call me in the US at [phone number redacted]? Same number on Signal (which I prefer) and WhatsApp. Best, Alan[.][12]

30.     Similarly, on July 12, 2023, Suderman sent another message via LinkedIn.com to Kevin Whelan, the founder of one of C5 Capital's portfolio companies, ITC Secure, in which he wrote:

> Hi Mr. Whelan, My name is Alan Suderman and I'm an investigative reporter at the Associated Press. I'm working on a story about Andre Pienaar and C5 [Capital]. *I have some reporting showing financial irregularities with how Andre operated C5, including records that indicate he may have used investor funds for personal gain.* Your name pops up on some of the documents I have. I've also spoken with some folks who used to work with Andre and they suggested I reach out to you. I know this might be a sensitive topic for you, so happy to talk off the record. I'm mostly looking to confirm a few details in my reporting. Could you please call me in the US at [phone number redacted]? Same number on Signal (which I prefer) and WhatsApp. Best, Alan[.][13]

31.     These were not Suderman's only messages to Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances. Suderman has sent substantially similar messages to dozens of other people referring to Mr. Pienaar supposedly causing financial irregularities and using investor funds for personal gain at C5 Capital.

32.     Suderman's accusations and implications about Mr. Pienaar are categorically and unequivocally false. Mr. Pienaar has never caused "financial irregularities" at C5 Capital (or anywhere) and has never "used investor funds for personal gain," and Suderman did not have

---

[12] Emphasis added. A true and accurate copy of the July 11, 2023 message from Suderman to Ms. Streatfeild is attached hereto as **Exhibit A**.

[13] Emphasis added. A true and accurate copy of the July 12, 2023 message from Suderman to Mr. Whelan is attached hereto as **Exhibit B**.

documents or records supporting his accusations. Directly contrary to Suderman's accusations, Mr. Pienaar has throughout his career always acted legally, ethically, and with integrity, and he has operated C5 Capital with those same values and with dedication to its investors.

33.     Suderman's goal in sending his messages to Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances—including Ms. Streatfeild and Mr. Whelan—was not to verify information that he had uncovered. Rather, it was to falsely tell them that Mr. Pienaar has been involved in fraud and wrongdoing in an effort to bias them against Mr. Pienaar and induce them to either deny his accusations so that he could print that denial while reporting the underlying allegations that he invented as true, or to induce them to agree with his accusations regardless of the truth, whether as part of a response distancing themselves from supposed wrongdoing unknown to them (unknown to them because it did not occur) or as part of an effort to stop Suderman from further contacting them and possibly making accusations against them personally.

34.     Suderman's conduct is known as "push-polling"—a term derived from the opinion-polling industry in which a questioner attempts to bias and influence the responses of the person to whom he or she is asking questions.

35.     "Push-polling" is antithetical to legitimate newsgathering and violates fundamental tenets of journalistic ethics and practice. Indeed, such "push-polling" runs directly counter to the Associated Press's own "Values and Principles," which boast that "[w]e will not knowingly introduce rumor or false information into material intended for publication or broadcast" and that the Associated Press "insist[s] on the highest standards of integrity and ethical behavior as we

gather and deliver the news."[14]  Upon information and belief, Suderman, by virtue of his decade of employment at the Associated Press, knew that.

### Suderman Reveals That His False Accusations
### Against Mr. Pienaar Are Not Supported by His Claimed Evidence

36.     Notably, although Suderman claimed in his messages to Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances to have "reporting" and "records" substantiating his false accusations that Mr. Pienaar caused "financial irregularities" and "used investor funds for personal gain" at C5 Capital—Suderman's claim has (unsurprisingly) been shown to be a lie.  And that further demonstrates that Suderman knew his accusations against Mr. Pienaar were false.

37.     After Suderman sent his July 12, 2023 LinkedIn message to Kevin Whelan accusing Mr. Pienaar of causing "financial irregularities" and "us[ing] investor funds for personal gain" at C5 Capital and asking Mr. Whelan to call him, Mr. Whelan called Suderman.

38.     During a telephone call on or about July 17, 2023 Suderman repeated his accusations about Mr. Pienaar to Mr. Whelan, but when Mr. Whelan pressed Suderman for substantiation of those accusations, Suderman could not offer any except to point to a February 13, 2023 article published by the controversial media outlet Breitbart headlined "Exclusive—Emails, Documents Reveal Tangled Web of Amazon, Pentagon Connections Surrounding Defense Cloud Contract."[15]  But that article does not even purport to report on any supposed "financial irregularities" at C5 Capital or Mr. Pienaar supposedly "us[ing] investor funds for personal gain,"

---

[14]  Associated   Press   Values   and   Principles:   Introduction.   https://www.ap.org/about/news-values-and-principles/introduction.

[15]  Kristina Wong, *Exclusive—Emails, Documents Reveal Tangled Web of Amazon, Pentagon Connections Surrounding   Defense   Cloud   Contract*,   Breitbart   (Feb.   13,   2023), https://www.breitbart.com/politics/2023/02/13/exclusive-emails-documents-reveal-tangled-web-of-amazon-pentagon-connections-surrounding-defense-cloud-contract.

and thus it does not—and could not—provide any support for Suderman's false accusations. Indeed, the lack of any reference whatsoever to Suderman's false accusations in the article shows that Suderman made his false statements about Mr. Pienaar knowing that he had no support for them whatsoever.

39.     Moreover, on July 24, 2023, Suderman and Mr. Whelan spoke again via telephone. During that call, Suderman repeated his accusation about Mr. Pienaar causing "financial irregularities" at C5 Capital and asked Mr. Whelan if he knew that Mr. Pienaar "was using investor funds to fund his lavish lifestyle"—thus repeating his false accusations that Mr. Pienaar was misusing client funds. Mr. Whelan again pressed Suderman for support for his accusations, but Suderman could not provide any. Suderman could not provide any support for his accusations because there is no support for them—because Suderman's accusations are false. Rather, Suderman again could only point to the February 13, 2023 Breitbart article that did does not even purport to report on any supposed "financial irregularities" at C5 Capital or Mr. Pienaar supposedly "us[ing] investor funds for personal gain."

### Suderman Reveals His Motivation for Targeting Mr. Pienaar as an Attempt to Resuscitate and Capitalize on Years-Old, Publicly and Repeatedly Debunked Accusations Against Mr. Pienaar Peddled by RosettiStarr in Connection with a Bid for a Government Contract

40.     While the Breitbart article that Suderman cited to Mr. Whelan (and likely others) does not remotely support Suderman's claims, it is noteworthy in that Suderman's repeated citation of that article reveals his true motivation for seizing on Mr. Pienaar as a target on whom to report.

41.     The Breitbart article Suderman cited reports on a years-old dispute between business competitors for a lucrative government contract—the Joint Enterprise Defense Infrastructure Cloud Procurement (the "JEDI Cloud Procurement"). Specifically, it republishes years-old conspiratorial allegations that C5 Capital and Mr. Pienaar colluded and worked with

Sally Donnelly, who was then-Senior Advisor to then-Secretary of Defense James Mattis, to unlawfully and unethically obtain improper advantages in the procurement for Amazon Web Services.

42.    As has been widely reported in the media, those allegations originated with RosettiStarr, who peddled them at the behest of Oracle, a competitor for the JEDI Cloud Procurement, in an effort to undermine Amazon Web Services' bid for that contract (which was ultimately won by Microsoft).[16]

43.    The conspiratorial allegations were sensationalist, and they involved the exact type of narrative on which Suderman has focused his reporting in recent years: cybersecurity, corruption, criminality, and intrigue.

44.    But, as Suderman knew, the allegations peddled by RosettiStarr and republished in the Breitbart article were false and had been repeatedly and publicly debunked by the courts and governmental agencies to which Oracle presented them.

---

[16] *See* Naomi Nix, *Inside the Nasty Battle to Stop Amazon From Winning the Pentagon's Cloud Contract*, Bloomberg (Dec. 20, 2018), https://www.bloomberg.com/news/features/2018-12-20/tech-giants-fight-over-10-billion-pentagon-cloud-contract; Kevin Baron et al., *Someone Is Waging a Secret War to Undermine the Pentagon's Huge Cloud Contract*, Defense One (Aug. 20, 2018), https://www.defenseone.com/technology/2018/08/someone-waging-secret-war-undermine-pentagons-huge-cloud-contract/150685; *Dirty Tricks Surround Bidding for Pentagon Cloud-Computing Contract*, Seattle Times (Dec. 23, 2018), https://www.seattletimes.com/business/dirty-tricks-surround-bidding-for-pentagon-cloud-computing-contract; Sebastian Moss, *Pentagon Inspector General to Review Congressional Request to Investigate JEDI Cloud Contract*, Data Center Dynamics (Oct. 25, 2018), https://www.datacenterdynamics.com/en/news/pentagon-inspector-general-review-congressional-request-investigate-jedi-cloud-contract; John Furrrier, *I Broke the JEDI DoD Oracle Story in March Posted It on My Forbes Column and Forbes Censored It by Taking It Down*, Medium (Mar. 6, 2019), https://medium.com/@furrier/yesterday-i-had-a-story-taken-down-on-forbes-for-a-post-about-jedi-dod-33675fd89a01; Joseph Tsidulko, *Oracle Reportedly Funding Secretive Anti-Amazon Lobbying Group*, CRN (Sept. 20, 2019), https://www.crn.com/news/cloud/oracle-reportedly-funding-secretive-anti-amazon-lobbying-group.

45.     **The General Accountability Office (GAO),** denied a protest of the JEDI Cloud Procurement by Oracle and specifically rejected the assertion that conflicts of interest gave Amazon Web Services an unfair competitive advantage in it.[17]

46.     **The Court of Federal Claims** rejected Oracle's protest of the JEDI Cloud Procurement, specifically affirming as "reasonable and well supported" the Contracting Officer's conclusion that Amazon Web Services did not obtain any improper "competitive advantage."[18]

47.     **The U.S. Court of Appeals for the Federal Circuit** affirmed the Court of Federal Claims' decision rejecting Oracle's protest of the JEDI Cloud Procurement, also specifically rejecting "the extensive array of claims raised by Oracle."[19]

48.     **The Department of Defense Office of the Inspector General** concluded—in a 300+ page report issued after conducting more than 80 interviews and reviewing 32 gigabytes of documents and information—that there was "no evidence" to support accusations of unlawful or unethical attempts to benefit Amazon Web Services relating to Ms. Donnelly in the JEDI Cloud Procurement.[20]

49.     And the **Acting Director of the Office of Management and Budget,** the **Executive Chair of the Council of Inspectors General on Integrity and Efficiency,** the

---

[17] *In re Oracle America, Inc.,* B-416657; B-416657.2; B-416657.3; B-416657.4 (Comp. Gen. Nov. 14, 2018), *available at* https://www.gao.gov/assets/b-416657%2Cb-416657.2%2Cb-416657.3%2Cb-416657.4.pdf.

[18] *Oracle Am., Inc. v. United States,* 144 Fed. Cl. 88, 125-26 (2019).

[19] *Oracle Am., Inc. v. United States,* 975 F.3d 1279, 1302-03 (Fed. Cir. 2020).

[20] Inspector General of the Department of Defense, Report No. DODIG-2020-079, *Report on the Joint Enterprise Defense Infrastructure (JEDI) Cloud Procurement* 7, 9, 200-01 (Apr. 13, 2020), *available at* https://media.defense.gov/2020/Apr/21/2002285087/-1/-1/1/REPORT%20ON%20THE%20JOINT%20ENTERPRISE%20DEFENSE%20INFRASTRUCTURE%20(JEDI)%20CLOUD%20PROCUREMENT%20DODIG-2020-079.PDF; *see also* Letter from Sean W. O'Donnell (Acting Inspector General, Department of Defense) to Hon. Charles Grassley & Hon. Richard Durbin at 3-4 (Sept. 15, 2021) [hereinafter "DoD Inspector General Letter"], *available at* https://www.grassley.senate.gov/imo/media/doc/defense_dept.inspectorgeneraltograssleyjedireview.pdf.

**U.S. Attorney's Office for the Eastern District of Virginia**, and the **Public Integrity Section of the Department of Justice's Criminal Division** all likewise rejected those same allegations.[21]

50.     In short, the conspiratorial accusations peddled by RosettiStarr and Oracle and reported in the Breitbart article were pure fiction and were publicly shown to be pure fiction, again and again, by each court and government agency that considered them.

51.     Indeed, numerous responsible journalists refused to republish those accusations— because they are false.

52.     Upon information and belief, Suderman, as an experienced reporter for the Associated Press who focuses his reporting on issues involving cybersecurity and alleged corruption, influence, and criminality, was aware that the accusations against Mr. Pienaar peddled by RosettiStarr and reported by Breitbart had been repeatedly publicly debunked, including by the courts and agencies listed above.

53.     But, upon information and belief, Suderman didn't care:  He knew that the mere prior publication of those false accusations made Mr. Pienaar an easy target for reporting that could generate the next big media firestorm—and advance his journalistic career.

54.     Suderman also knew, however, that the so-called "reporting" he was using to justify his falsehoods against Mr. Pienaar did not contain any evidence that Mr. Pienaar had caused any financial irregularities at C5 Capital or had misused investors' money.

---

[21] DoD Inspector General Letter at 4.

**Suderman Harasses Mr. Pienaar's Associates and Threatens Them
to Try to Coerce Them to Confirm His False Accusations Against Mr. Pienaar,
and Suderman Knowingly Works with Disgruntled Former C5 Capital Affiliate Employee
William Kilmer to Further Threaten Mr. Pienaar's Associates**

55.     Remarkably, Suderman has done more than "just" push-poll false accusations about Mr. Pienaar to his colleagues, former colleagues, associates, investors, and acquaintances in an effort to manufacture support for his preconceived narrative of Mr. Pienaar's (supposed) corruption and criminal conduct that he wants to tell.

56.     On numerous occasions, when Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances declined to respond to Suderman's outreaches, Suderman continued to contact them, repeatedly, including at all hours of the night—to the point of harassment.

57.     And worse still, because apparently his push-polling and harassment did not elicit the negative comments he hoped to generate for his story, Suderman has gone so far as to threaten Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances that if they do not provide negative comments about Mr. Pienaar to him then he will write about them in the hit piece he is working on.

58.     Moreover, Suderman has not acted alone in threatening Mr. Pienaar's colleagues, former colleagues, associates, investors, and acquaintances.  In addition to directly threatening them, Suderman has worked closely with William Kilmer—a former employee of C5 Capital USA LLC and ITC Global Security Limited (affiliates of C5 Capital) who he knows to be disgruntled and biased against Mr. Pienaar and who is facing a lawsuit by C5 Capital affiliates for misappropriating tens of thousands of dollars—in a further effort to manufacture his damning, but false, story about Mr. Pienaar.

59.     To that end, and upon information and belief with Suderman's knowledge and at his direction, Kilmer has contacted numerous current and former employees of C5 Capital and its affiliates and has not simply "encouraged" them to speak to Suderman about Mr. Pienaar, but has threatened them that if they do not speak with Suderman and/or make negative statements about Mr. Pienaar, then Suderman will "put [them] in his article."

60.     Suderman's goal in working with Kilmer is to manufacture (false) corroboration for the false accusations he wants to publish about Mr. Pienaar. And Suderman's conduct in doing so further demonstrates his knowledge that those accusations—that Mr. Pienaar caused "financial irregularities" and "used investor funds for personal gain" at C5 Capital—are false.

### Suderman's False and Defamatory *Per Se* Accusations Have Caused Harm to Mr. Pienaar and His Reputation

61.     As detailed above, Suderman's statements that Mr. Pienaar caused "financial irregularities" and "used investor funds for personal gain" at C5 Capital are unequivocally and demonstrably false. Mr. Pienaar has done no such things.

62.     Moreover, those statements, which accuse Mr. Pienaar of criminal activity and unfitness for his profession, are defamatory *per se*.

63.     And even more, Suderman's false and defamatory statements have caused actual damage to Mr. Pienaar. Among other things, Suderman's statements and implications have caused the persons to whom he made them—including Mr. Whelan (who continues to be an active member of the cybersecurity investment community in which Mr. Pienaar works) and Ms. Streatfeild— to question Mr. Pienaar's good character, professional ethics, and fitness for his profession.

64.     Suderman's accusations have further caused distress to Mr. Pienaar personally.

## COUNT ONE: DEFAMATION
## FOR THE STATEMENT IN THE
## JULY 11, 2023 MESSAGE TO PIPPA STREATFEILD

65.     Mr. Pienaar repeats, re-alleges, and incorporates by reference the allegations in
Paragraphs 1-64 as if set forth fully herein.

66.     On July 11, 2023, Suderman sent Pippa Streatfeild a message on LinkedIn
(https://www.linkedin.com) that contained the following false and defamatory statement of fact
concerning Mr. Pienaar:

> I have some reporting showing financial irregularities with how Andre operated
> C5, including records that indicate he may have used investor funds for personal
> gain.

67.     Suderman published the statement by authoring it and sending it to Ms. Streatfeild
in a message via the LinkedIn website.  A true and correct copy of the LinkedIn message containing
the statement is attached hereto as **Exhibit A**.

68.     The statement is of and concerning Mr. Pienaar.  Indeed, the statement identifies
Mr. Pienaar by name (Andre) and the sentence in the message immediately preceding the statement
identifies Mr. Pienaar by his full name (Andre Pienaar).

69.     The statement is false.  Mr. Pienaar has never operated C5 Capital in any irregular,
unethical, or unlawful manner or caused "financial irregularities" at C5 Capital, and he has never
used investor funds for personal gain—and, accordingly, no authentic documents would show that
Mr. Pienaar operated C5 Capital in any irregular, unethical, or unlawful manner, that he caused
"financial irregularities" at C5 Capital, or that he used investor funds for personal gain.

70.     The statement is defamatory—and Ms. Streatfeild understood it to be defamatory—
because it tends to expose Mr. Pienaar to contempt, to discourage others from associating or
dealing with Mr. Pienaar, and to harm Mr. Pienaar's reputation in the estimation of the community.

71.     The statement is defamatory *per se* because, without reference to extrinsic evidence and viewed in its plain and obvious meaning, it imputes to Mr. Pienaar the commission of criminal offenses involving moral turpitude, it imputes to Mr. Pienaar unfitness to perform duties of his profession as founder, CEO, and Head of Investor Relations of a specialist venture capital firm, it imputes to Mr. Pienaar a lack of integrity in the performance of the duties of his profession, and it prejudices Mr. Pienaar in his profession.  Mr. Pienaar is therefore entitled to presumed damages.

72.     Suderman knew the substantial danger of injury to Mr. Pienaar and his reputation from the statement, which is readily apparent, and he in fact intended to cause injury to Mr. Pienaar by making the statement.

73.     By publishing the statement, Mr. Pienaar did cause harm to Mr. Pienaar and his reputation, including by causing Ms. Streatfeild to question whether Mr. Pienaar had committed a crime, engaged in improper or unethical actions, and/or lacked integrity in his profession and his employment as Founder, CEO, and Head of Investor Relations of C5 Capital.

74.     Suderman published the statement with actual malice in that he had actual, subjective knowledge that the statement was false at the time he published it.  Suderman had (and has) actual knowledge of the falsity of the statement because he was aware that the supposed "reporting" and "records" he claimed supported his statement do no such thing—indeed, that reporting, a February 13, 2023 Breitbart article, contained no reference at all to supposed "financial irregularities with how Andre operated C5" or "records that indicate he may have used investor funds for personal gain."

75.     Suderman published the statement as part of a preconceived narrative targeting Mr. Pienaar and accusing him of being a corrupt businessman and criminal in line with Suderman's

reporting on cybersecurity and alleged criminality, thus further evidencing his actual malice in publishing it.

76.     Suderman published the statement with actual malice because, at a minimum, he had serious doubts as to the truth of the statement and a high degree of awareness that it was probably false and thereby published it with reckless disregard for the truth.

77.     Suderman's publication of the false and defamatory statement was negligent at a minimum.

78.     Suderman had no applicable privilege or legal authorization to publish the statement or, if he did, he abused that privilege.

79.     As a direct and proximate result of Suderman making his false statement, Mr. Pienaar has suffered damages, including, *inter alia*, injury to his reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

80.     Suderman made the statement maliciously, willfully, wantonly, and with a conscious disregard for Mr. Pienaar's rights. Accordingly, punitive damages are appropriate.

### COUNT TWO: DEFAMATION
### FOR THE STATEMENT IN THE
### JULY 12, 2023 MESSAGE TO KEVIN WHELAN

81.     Mr. Pienaar repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1-64 as if set forth fully herein.

82.     On July 12, 2023, Suderman sent Kevin Whelan a message on LinkedIn (https://www.linkedin.com) that contained the following false and defamatory statement of fact concerning Mr. Pienaar:

> I have some reporting showing financial irregularities with how Andre operated C5, including records that indicate he may have used investor funds for personal gain.

83.     Suderman published the statement by authoring it and sending it to Mr. Whelan in a message via the LinkedIn website. A true and correct copy of the LinkedIn message containing the statement is attached hereto as **Exhibit B**.

84.     The statement is of and concerning Mr. Pienaar. Indeed, the statement identifies Mr. Pienaar by name (Andre) and the sentence in the message immediately preceding the statement identifies Mr. Pienaar by his full name (Andre Pienaar).

85.     The statement is false. Mr. Pienaar has never operated C5 Capital in any irregular, unethical, or unlawful manner or caused "financial irregularities" at C5 Capital, and he has never used investor funds for personal gain—and, accordingly, no authentic documents would show that Mr. Pienaar operated C5 Capital in any irregular, unethical, or unlawful manner, that he caused "financial irregularities" at C5 Capital, or that he used investor funds for personal gain.

86.     The statement is defamatory—and Mr. Whelan understood it to be defamatory—because it tends to expose Mr. Pienaar to contempt, to discourage others from associating or dealing with Mr. Pienaar, and to harm Mr. Pienaar's reputation in the estimation of the community.

87.     The statement is defamatory *per se* because, without reference to extrinsic evidence and viewed in its plain and obvious meaning, it imputes to Mr. Pienaar the commission of criminal offenses involving moral turpitude, it imputes to Mr. Pienaar unfitness to perform duties of his profession as founder, CEO, and Head of Investor Relations of a specialist venture capital firm, it imputes to Mr. Pienaar a lack of integrity in the performance of the duties of his profession, and it prejudices Mr. Pienaar in his profession. Mr. Pienaar is therefore entitled to presumed damages.

88.     The statement is false. Mr. Pienaar has never operated C5 Capital in any irregular, unethical, or unlawful manner and has never used investor funds for personal gain—and,

22

accordingly, no authentic documents would demonstrate that Mr. Pienaar operated C5 Capital in any irregular, unethical, or unlawful manner or used investor funds for personal gain.

89.     Suderman knew the substantial danger of injury to Mr. Pienaar and his reputation from the statement, which is readily apparent, and he in fact intended to cause injury to Mr. Pienaar by making the statement.

90.     By publishing the statement, Mr. Pienaar did cause harm to Mr. Pienaar and his reputation, including by causing Mr. Whelan to question whether Mr. Pienaar had committed a crime, engaged in improper or unethical actions, and/or lacked integrity in his profession and his employment as Founder, CEO, and Head of Investor Relations of C5 Capital.

91.     Suderman published the statement with actual malice in that he had actual, subjective knowledge that the statement was false at the time he published it. Suderman had (and has) actual knowledge of the falsity of the statement because he was aware that the supposed "reporting" and "records" he claimed supported his statement do no such thing—indeed, that reporting, a February 13, 2023 Breitbart article, contained no reference at all to supposed "financial irregularities with how Andre operated C5" or "records that indicate he may have used investor funds for personal gain."

92.     Suderman published the statement as part of a preconceived narrative targeting Mr. Pienaar and accusing him of being a corrupt businessman and criminal in line with Suderman's reporting on cybersecurity and alleged criminality, thus further evidencing his actual malice in publishing it.

93.     Suderman published the statement with actual malice because, at a minimum, he had serious doubts as to the truth of the statement and a high degree of awareness that it was probably false and thereby published it with reckless disregard for the truth.

94.     Suderman's publication of the false and defamatory statement was negligent at a minimum.

95.     Suderman had no applicable privilege or legal authorization to publish the statement or, if he did, he abused that privilege.

96.     As a direct and proximate result of Suderman making his false statement, Mr. Pienaar has suffered damages, including, *inter alia*, injury to his reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

97.     Suderman made the statement maliciously, willfully, wantonly, and with a conscious disregard for Mr. Pienaar's rights. Accordingly, punitive damages are appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Pienaar respectfully requests that the Court enter judgment in his favor and against Defendant Suderman, as follows:

- Award Mr. Pienaar $10,000,000 in presumed and compensatory damages;

- Award Mr. Pienaar $350,000 in punitive damages;

- Issue a narrowly tailored injunction that prohibits Defendant Suderman from repeating or republishing the false and defamatory statements that form the basis of Mr. Pienaar's claims; and

- Award Mr. Pienaar such other and further relief, whether at law or in equity, that the Court deems just and proper.

## JURY DEMAND

Mr. Pienaar demands a jury trial for all claims triable by way of jury.

Dated: September 15, 2023

Thomas A. Clare, P.C. (VA Bar No. 39299)
Joseph R. Oliveri (VA Bar No. 77152)
Steven Harrison (VA Bar No. 92277)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
tom@clarelocke.com
joe@clarelocke.com
steven@clarelocke.com

Meghan Gosline (VA Bar No. 89163)
HANCOCK, DANIEL & JOHNSON, P.C.
4701 Cox Road, Suite 400
Glen Allen, VA 23060
Telephone: (866) 9670-9604
mgosline@hancockdaniel.com

*Attorneys for Plaintiff André Pienaar*

# EXHIBIT A

16:37

< All Inboxes  ∨

# Media inquiry - Andre Pienaar/C5

                           Pippa Streatfeild 

Hello Ms. Streatfeild,

My name is Alan Suderman and I'm a reporter at the Associated Press. I'm working on a story about Andre Pienaar and C5.

I have some reporting showing financial irregularities with how Andre operated C5, including records that indicate he may have used investor funds for personal gain. I've also spoken with some folks who used to work with Andre and they suggested I reach out to you to help me confirm some details.

I know this might be a sensitive topic for you, so happy to talk off the record. Your perspective could really help.

Could you please call me in the US at Redacted Redacted? Same number on Signal (which I prefer) and WhatsApp.

Best, Alan

                              

# EXHIBIT B

Request to connect

1.

2.
    Alan S.

      🖾

    Alan S.

    3rd degree connection· 3rd
    Reporter at the Associated Press

3. JUL 12Alan S. sent the following message at 3:57 PM

    🖾
    View Alan's profile

    Alan S. 3:57 PM

### Media inquiry - Andre Pienaar/C5

Hi Mr. Whelan, My name is Alan Suderman and I'm an investigative reporter at the Associated Press. I'm working on a story about Andre Pienaar and C5. I have some reporting showing financial irregularities with how Andre operated C5, including records that indicate he may have used investor funds for personal gain. Your name pops up on some of the documents I have. I've also spoken with some folks who used to work with Andre and they suggested I reach out to you. I know this might be a sensitive topic for you, so happy to talk off the record. I'm mostly looking to confirm a few details in my reporting. Could you please call me in the US at ▓Redacted▓? Same number on Signal (which I prefer) and WhatsApp. Best, Alan

4. JUL 13Kevin Whelan sent the following message at 5:31 PM

View Kevin's profile

Kevin Whelan  5:31 PM

I am busy today and tomorrow, I am happy to talk to you early next week.

5. Alan S. sent the following messages at 5:42 PM

View Alan's profile

Alan S.  5:42 PM

Works for me, thanks.

6. JUL 17

View Alan's profile

Alan S.  5:29 PM

Hey Kevin, you around today or tomorrow?

7. JUL 24 Kevin Whelan sent the following message at 5:15 PM

View Kevin's profile

Kevin Whelan  5:15 PM

i am around now for 2 hours and tomorrow from 1300 Uk time (GMT+1)

8. Alan S. sent the following messages at 5:32 PM

View Alan's profile

Alan S.  5:32 PM

Now works for me. What's a good number?

# COVER SHEET FOR FILING CIVIL ACTIONS

COMMONWEALTH OF VIRGINIA

Case No. ...........................................................
(CLERK'S OFFICE USE ONLY)

........................ Chesterville County ........................ Circuit Court

André Pienaar ........................ v./In re: ........................ Alan Suderman
PLAINTIFF(S) ........................ DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [ ] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [X] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [ ] Other General Tort Liability

## ADMINISTRATIVE LAW

- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY

- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested♦
  - [ ] Complaint – Uncontested♦
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS

- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS

- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS

- [ ] Amend Birth/Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

[X] Damages in the amount of $ 10,350,000.00 ........................ are claimed.

9/15/2023
DATE

[ ] PLAINTIFF  [ ] DEFENDANT  [X] ATTORNEY FOR  [X] PLAINTIFF [ ] DEFENDANT

Thomas A. Clare, P.C.
PRINT NAME

CLARE LOCKE LLP
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

10 Prince Street, Alexandria, VA 22314

EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

FORM CC-1416 (MASTER) PAGE ONE: 02/23

♦"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.